In re James L. BARBER, Debtor.

K–B Building Co., Plaintiff,

v.

James L. Barber, Defendant.

Bankruptcy No. 01–22820–BM.
Adversary No. 01–2286–BM.

United States Bankruptcy Court,
W.D. Pennsylvania.

Aug. 9, 2002.

618

Vincent J. Barbera, Barbera, Clapper, Beener, Rullo & Melvin, Somerset, PA, for Plaintiff.

James R. Walsh, Spence, Custer, Saylor, Wolfe & Rose, Johnstown, PA, for Defendant.

## MEMORANDUM OPINION

BERNARD MARKOVITZ, Bankruptcy Judge.

Plaintiff K–B Building Company (hereinafter "K–B") seeks a determination that a debt owed to it by debtor James Barber arising from a judgment previously entered against him in a fraudulent transfer action brought in state court is excepted from discharge in accordance with § 523(a)(2)(A) of the Bankruptcy Code.

Debtor denies that the debt is excepted from discharge by this provision.

We conclude that § 523(a)(2)(A) applies and that the debt is not dischargeable.

### FACTS

K–B is in the business of installing rigging for industrial customers in the Johnstown, Pennsylvania, area.

Hermara Associates, which ceased operating in the third quarter of 1997, was a competitor of K–B. It. Debtor became a shareholder of Hermara in 1993 and served as its president from 1993 until it ceased operating. He owned forty-nine percent of its shares of stock at all relevant times while a close family member owned the remainder.

Sheesley Construction was a mechanical contractor. Among other things, it installed piping for industrial customers. It ceased operating at some time after August of 1996. Debtor served as its president from 1994 until it ceased operating and owned forty-nine percent of its stock in 1994, 1995 and 1996.

Hermara and Sheesley are closely-related corporations whose exact legal relationship is not clear from the record. One witness described them as "sister" corporations.

Many of Hermara's employees also were employees of Sheesley. Hermara paid them when they did work for Hermara while Sheesley paid them when they did work for Sheesley.

After three individuals left their employment with K–B in the summer and fall of 1993 and began working for Hermara, K–B brought a lawsuit in state court in November of 1993 against Hermara, debtor and the three former employees. Among other things, K–B alleged that Hermara, debtor and its former employees had tortiously interfered with K–B's contractual relations with its customers, had tortiously interfered with its prospective business relations, and had participated in a civil conspiracy against it. A jury ultimately found in favor of K–B with respect to these claims and determined, among other things, that Hermara was liable to K–B in the amount of $300,000 and that debtor was liable to it in the amount of $10,000.

The judgment entered in the case was affirmed on appeal to the Superior Court of Pennsylvania on July 30, 1999. Debtor eventually satisfied the judgment against him. The judgment against Hermara, however, was never satisfied.

Prior to the commencement of the above lawsuit, Hermara paid debtor $100 as salary every two weeks during 1993. The purpose of this payment is unclear as debtor testified he provided no services to or for Hermara. On December 18, 1993, approximately one month after the above lawsuit was commenced, Hermara paid debtor the sum of $10,000 in supposed compensation. These payments from Hermara to debtor in 1993 totaled $12,5000. It also paid him a total of $19,6000 in 1994, $36,800 in 1995, $11,060 in 1996, and $17,300 in the first three quarters of 1997. The total amount it paid to debtor during this approximately four-year period was $84,760. Again, the purpose of these payments is at best curious as no services were rendered.

During the time that it was making these payments to debtor, Hermara also paid Sheesley a total of $300,000 in purported management fees. It paid Sheesley $50,000 in 1993, $125,000 in 1994, $50,000 in 1995 and $75,000 in 1996. These payments are also curious as Hermara paid the employees as it used them. No credible evidence was offered as to who managed what or who this entity managed.

On May 4, 1999, K–B brought a second lawsuit in state court against debtor and Hermara pursuant to Pennsylvania's Fraudulent Transfer Act ("PUFTA"), 12 Pa.C.S.A. § 5101 *et seq.* K–B alleged, among other things, that Hermara had made numerous transfers to debtor commencing in the latter part of 1993 and continuing until 1997 with actual intent to defraud K–B. All of these transfers took place after K–B had commenced the previous lawsuit. Hermara, K–B alleged, did not receive reasonably equivalent value in exchange for the transfers and intended, believed, or reasonably should have believed that it would incur debts beyond its ability to pay as they became due. K–B requested that the transfers to debtor be avoided and that judgment be entered against debtor in the total amount of the transfers.

K–B previously had brought a similar lawsuit against Hermara and Sheesley in 1997 concerning the above "management fees" totaling $300,000 Hermara had paid to Sheesley.

Debtor filed a voluntary chapter 7 petition on March 22, 2001, thereby staying the pending fraudulent transfer action as it pertained to him.

K–B was granted relief from the automatic stay on June 8, 2001, to allow it to pursue its pending fraudulent transfer action against debtor in state court.

Debtor brought this adversary action on July 18, 2001, seeking a determination that the debt owed to it by debtor as a result of the above alleged fraudulent transfers to him by Hermara is excepted from discharge in accordance with § 523(a)(2)(A) of the Bankruptcy Code.

On August 6, 2001, after conducting a non-jury trial, the state court rendered a verdict in the fraudulent transfer actions in favor of K–B and against Hermara and Sheesley in the amount of $300,000 and against Hermara and debtor in the amount of $74,760, respectively.

Along with its verdict, the state court made certain findings and conclusions. It determined that Hermara's debts during calendar years 1993, 1994, 1995 and 1996 exceeded the value of its assets at fair valuation and that Hermara therefore was insolvent during those years pursuant to 12 Pa.C.S.A. § 5102(a) (¶¶ 1, 2). Hermara made the transfers to Sheesley totaling $300,000 and to debtor totaling $74,760 without receiving reasonably equivalent value in return (¶¶ 3, 4). Hermara, through its officers and agents, reasonably should have believed that it would incur debts during these calendar years beyond its ability to pay as they became due (¶ 5). The transfers by Hermara to Sheesley and to debtor "were made by the officers and agents of Hermara Associates, Inc. with the actual intent to defraud Plaintiff" (¶ 7).

Debtor subsequently appealed the judgment that was entered against him in accordance with the verdict. The appeal has not been decided and is pending before the Superior Court of Pennsylvania.

The present adversary action brought against debtor by K–B was tried before this court of May 31, 2002.

## DISCUSSION

K–B seeks a determination that the debt owed to it by debtor in the amount of

$74,760 arising out of the judgment in the above fraudulent transfer action is excepted from discharge by 11 U.S.C. § 523(a)(2)(A), which provides in part as follows:

(a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—....

(2) for money, ... to the extent obtained, by —

(A) false pretenses, a false representation, or actual fraud.

The debt owed to it by debtor, K–B asserts, was the result of fraud on debtor's part and consequently is excepted from discharge by this provision.

K–B's position primarily is based on the proposition that collateral estoppel prevents debtor from denying that the debt in question was the result of actual fraud on his part. The state court determined in paragraph 7 of its findings and conclusions that the transfers from Hermara to debtor "were made by the officers and agents of Hermara, Inc. with actual intent to defraud [K–B]". It follows from this finding, K–B maintains, that the transfers were made with actual intent *on debtor's part* to defraud K–B. The issue whether debtor committed actual fraud in connection with the transfers made to him, in other words, was previously decided in the affirmative by the state court.

### A. Collateral Estoppel

■ Collateral estoppel applies to objections to the discharge of a debt brought under § 523(a)(2)(A). *Grogan v. Garner*, 498 U.S. 279, 285 n. 11, 111 S.Ct. 654, 658 n. 11, 112 L.Ed.2d 755 (1991). Even though exclusive jurisdiction to determine whether a particular debt is discharged resides in the bankruptcy court, collateral estoppel may apply to prevent relitigation of issues relevant to dischargeability of a

debt. *Gober v. Terra + Corp. (Matter of Gober)*, 100 F.3d 1195, 1201 (5th Cir.1996).

The Full Faith and Credit Act, 28 U.S.C. § 1738, requires a federal court to accord judicial proceedings brought in a state tribunal the "same full faith and credit ... as they have by law or usage in the courts of such State". This provision requires a federal court to defer to the law of preclusion of the state in which a judgment was rendered. It directs a federal court to apply the rules of preclusion that apply in the state from which the judgment was taken. *Marrese v. American Academy of Orthopaedic Surgeons*, 470 U.S. 373, 380, 105 S.Ct. 1327, 1331–32, 84 L.Ed.2d 274 (1985).

■ This principle applies where issue preclusion, also known as collateral estoppel, is involved. A federal court must give a state-court judgment the same preclusive effect as it would have under the law of the state in which it was rendered. *Migra v. Warren City School District Board of Education*, 465 U.S. 75, 81, 104 S.Ct. 892, 896, 79 L.Ed.2d 56 (1984).

Because the judgment at issue here was rendered by a Pennsylvania state court, we must apply the doctrine of collateral estoppel as articulated by Pennsylvania courts to determine whether the findings in the above fraudulent transfer action have preclusive effect with respect to the dischargeability of the debt at issue.

■ Collateral estoppel applies under Pennsylvania law only if: (1) the issue decided in a prior case was identical to one presented in a later case; (2) there was a final judgment on the merits in the prior case; (3) the party against whom it is asserted was a party in the prior case or is in privity with a party who was; (4) the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the prior proceeding; and

(5) the determination made in the prior case was essential to the judgment rendered therein.[1] *City of Pittsburgh v. Zoning Board of Adjustment,* 522 Pa. 44, 55–56, 559 A.2d 896, 901 (1989).

■ Applying these principles to the matter presently before us, we conclude that debtor is *not* collaterally estopped from denying that the money giving rise to the debt he owes K–B was obtained by actual fraud on his part. Although debtor's participation is much more likely than not, the decision of the state court is not conclusive as to that issue.

The state court found in paragraph 7 of its findings and conclusions that the transfers Hermara made to debtor " were made by the officers ... of Hermara Associates, Inc. with the actual intent to defraud [K–B]". From this finding K–B would have us conclude that the state court determined that *debtor* himself acted with actual intent to defraud K–B. We decline to so conclude.

According to K–B, it logically follows from the state court's finding that "the officers" of Hermara acted with actual intent to defraud K–B that it had determined that *debtor* acted with actual intent to defraud K–B. This inference is not mandated. The phrase "the officers ... of Hermara" does not necessarily refer to each and every officer of Hermara. Consider the following proposition: "the pitchers lost the game for our team". It does not necessarily follow that each and every member of the pitching staff lost the ball game. The proposition can be true even if only some of the members of the pitching staff, as opposed to all of them, lost the game for our team.

The matter does not end there. Collateral estoppel does not apply here even if the state court did determine that debtor effected the transfers with actual intent to defraud K–B. Not all of the above requirements for collateral estoppel to apply are satisfied here.

For instance, the first of the requirements is not satisfied. We are not confident that the issue decided in the state court proceeding is identical to the issue presented in this case. The issue presented in the prior case was whether *Hermara* acted with actual intent to defraud K–B when it made the transfers to debtor. The question whether *debtor* acted with actual intent in this regard was *not* an issue in the prior case, as it is in this adversary action. Debtor was named as a defendant in the fraudulent transfer action brought in state court so that K–B could avoid the transfers Hermara made to him in accordance with 12 Pa.C.S.A. § 5107(a)(1), and a monetary judgment in the amount of the transfers could be entered against debtor as the initial transferee in accordance with 12 Pa.C.S.A. § 5108(b)(1).

The fourth of the above requirements of collateral estoppel also is not satisfied in this instance. We are not confident that debtor had a full and fair opportunity to litigate the issue whether *he* acted with actual intent to defraud K–B because the issue of his actual intent, as opposed to Hermara's actual intent, was not an issue in the prior case.

---

1. The pendency of debtor's appeal of the above state court judgment against does not necessarily prevent it from being considered as final for purposes of collateral estoppel. *See Kane v. Harpswell (In re Kane),* 254 F.3d 325, 328 (1st Cir.2001); *Ruyle v. Continental Oil Co.,* 44 F.3d 837, 846 (10th Cir.1994), *cert.* *denied,* 516 U.S. 906, 116 S.Ct. 272, 133 L.Ed.2d 193 (1995). A judgment is considered final under Pennsylvania law for purposes of collateral estoppel unless and until it is reversed on appeal. *Shaffer v. Smith,* 543 Pa. 526, 673 A.2d 872, 874–75 (1996)

Finally, and most importantly, the fifth of the above requirements of collateral estoppel is not satisfied in this case. It is not clear whether the judgment rendered in the state court action was based on 12 Pa.C.S.A. § 5104 or 12 Pa.C.S.A. § 5105. Irrespective of which provision was relied upon, if the state court did in fact determine that debtor acted with actual intent to defraud K–B, the determination was not essential to the judgment against debtor entered in that case.

12 Pa.C.S.A. § 5104 provides in part as follows:

(a) **General rule—**. A transfer made ... by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made ..., if the debtor made the transfer ...:

(1) with actual intent to ... defraud any creditor of the debtor; or

(2) without receiving a reasonably equivalent value in exchange for the transfer ..., the debtor ....

(ii) reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

If this is the provision on which the outcome of the state court action was based, a determination that debtor personally acted with actual intent to defraud K–B was not essential to the outcome. The state court found in paragraph 4 of its findings and conclusions that the transfers Hermara made to debtor were made without Hermara receiving reasonably equivalent value in return. It further found in paragraph 5 that Hermara would, during the calendar years in which the transfers were made, incur debts beyond its ability to pay as they became due.

These determinations together suffice for a finding that the transfers Hermara made to debtor were fraudulent as to present or future creditor in accordance with 12 Pa.C.S.A. § 5104(a)(2)(ii). The court's finding in paragraph 7 that the transfers were made with actual intent to defraud, whether on the part of Hermara or debtor personally, is superfluous or unnecessary for arriving at the conclusion that the transfers were fraudulent for purposes of § 5104. Subsections 5104(a)(1) and 5104(a)(2) are disjunctive, not conjunctive. A finding that both of these subsections are satisfied is not required. Only one of the these subsections need be satisfied for purposes of § 5404.

The conclusion is the same to the extent that the judgment rendered in the state court proceeding was based on 12 Pa. C.S.A. § 5105, which provides in part as follows:

A transfer made ... is fraudulent as to a creditor whose claim arose before the transfer was made ... if the debtor made the transfer ... without receiving a reasonably equivalent value in exchange for the transfer ... and the debtor was insolvent as a result of the transfer ....

If this is the provision on which the outcome of the case was based, a determination that debtor acted with actual intent to defraud K–B is not essential to the outcome. The court found in paragraph 2 of its findings and conclusions that Hermara was insolvent when it made the transfers. It also found in paragraph 4 that the transfers to debtor were made without Hermara receiving reasonably equivalent value in return. These two findings together suffice to establish that the transfers to debtor were fraudulent in accordance with § 5105. A determination that debtor acted with actual intent to defraud K–B is not only not essential to § 5105, it is not even relevant.

We conclude in light of the foregoing that debtor is not collaterally estopped as a result of the findings and conclusions arrived at in the fraudulent transfer action in state court from denying that the money he obtained from Hermara which gives rise to the debt he owes K–B was obtained by actual fraud.

### B. *Actual Fraud*

■ For the debt owed to K–B by debtor to be excepted from discharge by reason of § 523(a)(2)(A), K–B must prove that the above monetary payments debtor received from Hermara were obtained "by false pretenses, a false representation, or actual fraud". K–B contends that the payments in question were obtained by actual fraud on debtor's part. If it is to prevail on this basis, K–B must prove this by a preponderance of the evidence. *Grogan,* 498 U.S. at 286–87, 111 S.Ct. at 659.

■ Although the overwhelming preponderance of cases alleging fraud for purposes of § 523(a)(2)(A) involve what is commonly known as fraudulent misrepresentation, actual fraud and false representation are distinct concepts for purposes of this provision. Actual fraud is a broader concept than fraudulent misrepresentation and encompasses fraud that is not based on any representation. *Mellon Bank v. Vitanovich (In re Vitanovich),* 259 B.R. 873, 877 (6th Cir. BAP 2001)(citing *McClellan v. Cantrell,* 217 F.3d 890, 893 (7th Cir.2000)).

■ The term "fraud" is not defined in the Bankruptcy Code. It is a generic term encompassing any means by which one person gains advantage over another and includes any surprise, trick, cunning, disassembling, or unfair means by which another is cheated. *McClellan,* 217 F.3d at 893.

■ Fraud may be constructive or actual. It is constructive if the only evidence of fraud is the inadequacy of consideration.

It is actual if the debtor intended to hinder or delay a creditor. *McClellan,* 217 F.3d at 894. By its express terms, fraud required for purposes of § 523(a)(2)(A) must be actual. Constructive fraud will not suffice. *Equitable Bank v. Miller (In re Miller),* 39 F.3d 301, 306 (11th Cir.1994); *McClellan,* 217 F.3d at 894.

■ The totality of the evidence presented in this case leads us to conclude that debtor intended to defraud K–B by receiving the above payments from Hermara and that actual fraud on his part was present for purpose of § 523(a)(2)(A).

Debtor was an insider of Hermara at all relevant times. He was its president and owned forty-nine percent of its shares of stock. When Hermara made the above payments to debtor, it made them to an insider.

Debtor had virtually no involvement in Hermara's day-to-day operations. In spite of this, Hermara made alleged salary payments to debtor approximating on average $21,000 for each of the four years at issue here. Because debtor was not involved in its day-to-day operations, Hermara did not receive reasonably equivalent value in return for the salary payments.

Notwithstanding debtor's lack of involvement in Hermara's day-to-day operations, we are convinced that debtor participated in the decision to make significant payments to himself and to Sheesley, which decision was arrived at shortly after K–B commenced the first lawsuit against Hermara in November of 1993. Debtor's testimony that he was not involved in making this decision and that subordinates who were employed by Hermara and Sheesley made the decision without first advising him is not credible. It defies belief that the president of Hermara, who owned forty-nine percent of its stock, would permit subordinates who owned no

interest in Hermara to make such a major decision without first consulting him and obtaining his approval.

The payments from Hermara to debtor were "secret" as far as K–B was concerned. Although debtor and Hermara both reported the payments on their respective tax returns, this information was not available to K–B. The payments were not disclosed in any records to which K–B had ready access.

The payments in question were made in 1993, 1994, 1995, 1996 and 1997. Hermara had a positive net worth in 1993 but had a negative net worth in all of the other years. Hermara ceased operating in the third or fourth quarter of 1997, approximately one year after judgment in favor of K–B and against Hermara in the amount of $300,000 was entered in the first lawsuit involving Hermara.

The first significant payment to debtor occurred approximately one month after K–B brought its first lawsuit against Hermara in November of 1993 when Hermara made a payment to debtor in the amount of $10,000 in December of that same year. Hermara had been paying debtor only $100 every two weeks in 1993 before then.

Finally, Hermara also paid Sheesley a total of $300,000 in purported management fees during the same period that it made the above payments to debtor. At a minimum, it is curious that Hermara paid any management fees at all to Sheesley when many of Sheesley's employees, if not all, also were employed by Hermara. Sheesley paid them when they did work on behalf of Sheesley while Hermara paid them when they did work on behalf of Hermara.

Hermara's accountant testified at trial that these payments were made to Sheesley for tax purposes. A review of this testimony indicates that there was no factual basis offered by this witness (or any other) indicating that management services in fact were rendered and that the value of same was $300,000. To the contrary, we take from said testimony that the purpose of the payment was at best an effort to avoid and/or reduce the amount due on taxes.

Neither debtor nor the accountant explained why Sheesley was entitled to a management fee in the first place. In the absence of such an explanation, we strongly suspect that Hermara also did not receive reasonably equivalent value in return for these payments to Sheesley. We have no doubt that these payments and the payments to debtor were part of a single artifice to siphon off Hermara's assets to make them unavailable for satisfying any judgment K–B might obtain against Hermara in the first lawsuit. The scheme succeeded. Hermara had no assets with which the judgment against it could be satisfied and ceased doing business in 1997.

We conclude in light of the foregoing that debtor obtained monetary payments from Hermara by means of actual fraud and that he knowingly participated in a scheme to divert Hermara's assets for his own use to prevent K–B from satisfying any judgment that it might obtain against Hermara. The debt owed to K–B by debtor in the amount of $74,760 which arose from the judgment entered in the fraudulent transfer action brought in state court consequently is excepted from discharge by virtue of § 523(a)(2)(A) of the Bankruptcy Code.