**In re Jamie L. KIELUR a/k/a Jamie Lee Kielur, Debtor.**

**Tri–Boro Federal Credit Union, Plaintiff,**

**v.**

**Jamie L. Kielur a/k/a Jamie Lee Kielur, Defendant.**

**Bankruptcy No. 04–21716–MBM.
Adversary No. 04–2544–MBM.**

United States Bankruptcy Court, W.D. Pennsylvania.

April 21, 2005.

Robert J. Colaizzi, Pittsburgh, PA, for Tri–Boro Federal Credit Union.

Rawley F. Krasik, Pittsburgh, PA, for Jamie L. Kielur.

## MEMORANDUM OPINION

M. BRUCE MCCULLOUGH, Chief Judge.

Tri–Boro Federal Credit Union (hereafter "the Credit Union") commenced the instant adversary proceeding for the purpose of contesting the dischargeability of its pre-petition deficiency claim of $25,635.54 against Jamie Kielur, the instant debtor (hereafter "the Debtor"), pursuant to 11 U.S.C. § 523(a)(2)(A) and (B). For the reasons set forth below, the Court rules that the Credit Union's $25,635.54 claim is not nondischargeable under § 523(a)(2)(A) and (B), that is that such claim shall be discharged via the Chapter 7 discharge that will ultimately be received by the Debtor.

### STATEMENT OF FACTS

On or about May 31, 2002, the Debtor purchased a new 2002 Ford Mustang Convertible (hereafter "the Mustang") from Sturman & Larkin Ford (hereafter "S & L Ford"). The Debtor purchased the Mustang by trading in another vehicle and then apparently paying to S & L Ford the difference between such other vehicle's trade-in value and the price of the Mustang, which difference at least purportedly equalled $9,819. The Debtor apparently contends that he paid $1,500 of the $9,819 himself as a deposit on the Mustang, and that he borrowed the remainder of such amount, or $8,319, from the Credit Union. However, the Credit Union contends that the Debtor borrowed from the Credit Union all of the $9,819 that the Debtor needed to purchase the Mustang.

The Debtor borrowed the aforesaid funds from the Credit Union on or about May 31, 2002. Prior to said borrowing transaction the Debtor was already indebted to the Credit Union in an amount, according to records of the Credit Union, that totalled $34,120.53. After the May 31, 2002 borrowing transaction, the Debtor, according to records of the Credit Union, owed the Credit Union a total of $44,138.53. The trial record reveals that the only document that the Debtor executed in order to borrow the additional funds

from the Credit Union on or about May 31, 2002, was a loan application (hereafter "the Loan Application"). The Credit Union itself completed a document on May 31, 2002, entitled "Open–End Disbursement Receipt Plus," which document (hereafter "the Open–End Disbursement Receipt Plus") evidenced, *inter alia*, the May 31, 2002 borrowing transaction and the new amount of the Debtor's total indebtedness to the Credit Union; however, such document was not executed by the Debtor.

The Credit Union contends that the Debtor, prior to and/or at the time of the May 31, 2002 borrowing transaction, verbally informed the Credit Union that the Mustang was a Roush Stage III Mustang, that is a specialty Mustang worth much more than a typical Mustang coupe. The Debtor, on the other hand, denies ever having made any such verbal representation to the Credit Union.

The parties agree that, before the Debtor obtained the borrowed funds from the Credit Union on or about May 31, 2002, the Debtor hand-delivered to the Credit Union a document that was generated by S & L Ford, which document (a) the Court shall refer to as "the Purchase Order," and (b) sets forth the alleged terms of the Debtor's purchase of the Mustang from S & L Ford. According to the Purchase Order, (a) the list price of the Mustang was $45,565, (b) the Debtor was receiving a trade-in allowance for a 2002 Chrysler Sebring of $36,499.11, (c) the net cash balance owed to S & L Ford equalled $9,819, (d) a deposit was paid equal to $1,500, and (e) the cash due to S & L Ford at delivery of the Mustang equalled $8,319.

At the top of the Credit Union's copy of the Purchase Order appears the notation "Roush Stage 3;" a Credit Union representative testified that she made such notation herself after she first called S & L Ford and verified with someone at S & L Ford that the Mustang was a Roush Stage III Mustang. The preceding testimony by the Credit Union representative notwithstanding, the S & L Ford salesman indicated on the Purchase Order, Robert Popp (hereafter "Popp"), testified that he (a) never told the Credit Union that the Mustang was a Roush Stage III Mustang, and (b) never actually even spoke with anyone at the Credit Union regarding the Debtor's purchase of the Mustang. Popp conceded that the Credit Union may have spoken with someone from S & L Ford other than himself regarding the Debtor's purchase of the Mustang and that such other person may have told the Credit Union that the Mustang was a Roush Stage III Mustang, but he testified that Roush Stage III Mustangs were, in fact, not made for the car year 2002. Popp also testified that someone at S & L Ford other than himself actually generated the various numbers that appear on the Purchase Order. The Debtor testified that while hand-delivering the Purchase Order to the Credit Union he either never looked at the contents of said document or never thought about such contents.

The Credit Union introduced into evidence at trial a copy of a cashier's check from the Credit Union dated 5/31/02 and made payable to S & L Ford and the Debtor in the amount of $9,819. At the bottom of the Credit Union's copy of such check appears information regarding the Debtor's loan account with the Credit Union, which information appears to have been generated by a Credit Union computer. Contained within such information is a notation that the Mustang is a Roush Stage III Mustang. The Debtor testified that he hand-delivered the cashier's check from the Credit Union to S & L Ford after receiving it from the Credit Union in return for the Purchase Order; the Debtor also testified, however, that the aforesaid

computer-generated information regarding his loan account was not attached to such cashier's check when he obtained the same from the Credit Union. The Open–End Disbursement Receipt Plus, which document was not executed by the Debtor, also contains a notation that the Mustang was a Roush Stage III Mustang.

The Debtor made seventeen (17) payments of $738.74 each on his loan account with the Credit Union subsequent to financing the purchase of the Mustang with the Credit Union. On or about January 15, 2004, the Debtor voluntarily surrendered the Mustang to the Credit Union. It was shortly after such surrender, the Credit Union maintains, that it first learned that the Mustang was not a Roush Stage III Mustang but was instead a typical Mustang coupe. The Credit Union ultimately liquidated the surrendered Mustang in September 2004 for $14,104. The Credit Union asserts that a deficiency balance remains on the Debtor's loan account with the Credit Union equal to $25,635.54.

## DISCUSSION

The sum and substance of the Credit Union's nondischargeability action against the Debtor under § 523(a)(2)(A) and (B) is that:

(a) the Debtor knowingly, falsely represented, both orally and in writing, to the Credit Union that the Mustang was a Roush Stage III Mustang prior to receiving, and for the purpose of obtaining, from the Credit Union the additional funds that he needed to purchase the Mustang from S & L Ford, that is either $8,319 or $9,819,

(b) such alleged misrepresentations by the Debtor were material because, as it turns out, the Mustang, which vehicle constituted the Credit Union's lone collateral for its claim against the Debtor, was worth far less than what a Roush Stage III Mustang would have been worth, thereby ultimately resulting in a deficiency to the Credit Union when it liquidated the Mustang after its surrender by the Debtor,

(c) the Credit Union justifiably relied on such alleged misrepresentations by the Debtor,

(d) the Credit Union suffered loss as a result of such reliance because, as one would expect the Credit Union to argue, it would never have lent the aforesaid additional funds to the Debtor had it known that the Mustang was not a Roush Stage III Mustang, and

(e) the entirety of its $25,635.54 deficiency claim should thus be excepted from discharge.

The Debtor responds by maintaining that he never represented to the Credit Union, either orally or in writing, that the Mustang was a Roush Stage III Mustang. The Debtor further seeks the recovery of his attorney's fees and court costs that were incurred during the course of his defense of the Credit Union's nondischargeability action pursuant to 11 U.S.C. § 523(d).

## I. Pertinent law.

■ The Court holds, as an initial matter, that the Credit Union's nondischargeability cause of action under § 523(a)(2) properly lies, that is such cause of action is maintainable, only under § 523(a)(2)(A). The Court so rules because (a) the allegedly false representations upon which the Credit Union predicates such cause of action deal not with the Debtor's financial condition, (b) actions under § 523(a)(2)(B) are expressly limited to those that are predicated upon statements that pertain to a debtor's financial condition, see 11 U.S.C.A. § 523(a)(2)(B) (West 1993), and

(c) actions under § 523(a)(2)(A) are expressly limited to those other than ones that are predicated upon statements that pertain to a debtor's financial condition, *see* 11 U.S.C.A. § 523(a)(2)(A) (West 1993). 11 U.S.C. § 523(a)(2)(A) provides, in pertinent part, as follows:

> (a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt–
>
> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by–
>
> > (A) false pretenses, a false representation, or actual fraud.

11 U.S.C.A. § 523(a)(2)(A). "The party seeking to establish an exception to the discharge of a debt [under § 523(a)(2)(A)] bears the burden of proof ... by a preponderance of the evidence." *In re Jairath,* 259 B.R. 308, 313 (Bankr.N.D.Ill.2001); *see also In re Barber,* 281 B.R. 617, 624 (Bankr.W.D.Pa.2002) (same).

In order for a debt to be excepted from discharge under § 523(a)(2)(A) as one for "a false representation," a creditor must prove, by a preponderance of the evidence, that:

(1) the debtor made ... [a] representation;

(2) [at] the time of the representation, the debtor knew it to be false;

(3) the debtor made the representation with the intent and purpose of deceiving the plaintiff;

(4) the plaintiff ... [justifiably] relied on the representation ...; and

(5) the plaintiff sustained a loss or damage as the proximate consequence of the representation having been made.

4 *Collier on Bankruptcy,* ¶ 523.08[1][d] at 523–44.2 (Bender 2004) (citing *Field v. Mans,* 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995), to the effect that reliance required of a creditor is justifiable rather than reasonable under § 523(a)(2)(A)) & ¶ 523.08[1][e] at 523–45 to 46 (setting forth 5–part test); *see also, e.g., In re Orndorff,* 162 B.R. 886, 888 (Bankr.N.D.Okla.1994) (same test); *In re Homschek,* 216 B.R. 748, 751 (Bankr.M.D.Pa.1998) (same test); *In re Bruce,* 262 B.R. 632, 636 (Bankr.W.D.Pa.2001) (same test).

A creditor can also prevail under § 523(a)(2)(A)—or, for that matter, under § 523(a)(2)(B)—on the basis of a fraudulent misrepresentation by a debtor only to the extent that such debtor obtained "money, property, services, or an extension, renewal, or refinancing of credit" from such creditor by virtue of said misrepresentation. *See In re Booher,* 284 B.R. 191, 200 (Bankr.W.D.Pa.2002). Consequently, to the extent that a creditor's claim is predicated upon "money, property, services, or an extension, renewal, or refinancing of credit" that was obtained by a debtor prior to the making of a fraudulent misrepresentation by such debtor, such claim is not nondischargeable under § 523(a)(2)(A) or (B) by virtue of such misrepresentation. *See Id.* at 201. Finally, this Court, as a matter of law, has previously held

> that Congress, when using the phrase "extension, renewal, or refinancing of credit" in § 523(a)(2), had in mind an enforceable agreement to extend, renew, or refinance pre-existing credit, which agreement would simultaneously (a) extinguish the pre-existing indebtedness that is the subject of said extension, renewal, or refinancing, and (b) provide a creditor with a right to payment....
>
> Thus, ... if an extension, renewal, or refinancing of pre-existing indebtedness neither extinguishes pre-existing indebtedness nor provides a creditor with a right to payment, then the pre-existing debt necessarily remains, which pre-ex-

isting debt continues to provide the creditor with its right to payment. In that eventuality, (a) the debt that was established by the initial advance(s) of credit necessarily must be the subject of a creditor's nondischargeability complaint since a subsequent debt is never established, and (b) the issue of fraud on the debtor's part is only relevant as it pertains to the securing by the debtor of the initial advances of credit.

*In re Buzzelli,* Bankr.No. 97–23888–MBM, Adv. No. 98–2056–MBM (Mem. Opinion dated Feb. 25, 1999), at 13–15 (cited by the Court in *Booher,* 284 B.R. at 202–204).

## II. *Maximum amount of the Credit Union's claim that could be nondischargeable under § 523(a)(2)(A).*

■ Applying the foregoing law to the Credit Union's $25,635.54 deficiency claim, the Court first holds that only a portion of such claim could, in any event, be excepted from discharge pursuant to § 523(a)(2)(A) on the basis of the Debtor's alleged misrepresentations to the effect that the Mustang was a Roush Stage III Mustang. In particular, the Court holds that the only portion of such claim that could conceivably be so excepted from discharge is that portion equal to the additional funds that the Debtor borrowed from the Credit Union on or about May 31, 2002, so that he could then purchase the Mustang from S & L Ford, that is either $8,319 or $9,819. The Court so holds because such latter amount, that is either $8,319 or $9,819, is the only money that the Debtor obtained subsequent to allegedly having made representations to the effect that the Mustang was a Roush Stage III Mustang; consequently, such amount is the only money that the Debtor could have conceivably obtained by virtue of having allegedly made such representations. The remaining amount that the Debtor presently owes to the Credit Union on his loan account with them represents money that the Debtor obtained substantially prior to the point when he allegedly made the aforesaid representations to the Credit Union; consequently, such remaining amount could not conceivably have been obtained by the Debtor as a result of such representations.

■ The Court rules as it does notwithstanding (a) the Credit Union's contention that, on or about May 31, 2002, it refinanced the Debtor's entire indebtedness with the Credit Union rather than merely lent an additional $8,319 or $9,819 to the Debtor, and (b) an anticipated argument by the Credit Union that such refinancing, and thus the entire indebtedness of the Debtor to the Credit Union, was therefore obtained by the Debtor as a result of the alleged misrepresentations in question. The Court does so because, although the Credit Union may take the position internally that it so refinanced the Debtor's entire indebtedness rather than merely lent an additional $8,319 or $9,819 to the Debtor, the Court is constrained to conclude that such transaction between the parties does not constitute a refinancing for purposes of § 523(a)(2). The rationale for such conclusion follows. As set forth above, a "refinancing of credit" within the meaning of § 523(a)(2) requires for its existence an enforceable agreement to refinance pre-existing credit, which agreement would simultaneously (a) extinguish the pre-existing indebtedness that is the subject of said refinancing, and (b) provide a creditor with a right to payment. Unfortunately for the Credit Union, however, it never entered into an agreement with the Debtor on, about, or at any time after May 31, 2002, that served to extinguish, or that provided the Credit Union with a right to payment vis-a-vis, the debt that the Debtor owed to the Credit Union prior to the May 31, 2002 borrowing transaction. The

Court so concludes because the only document that the Debtor even executed on or about May 31, 2002, was the Loan Application, which document neither constitutes an "agreement" that would provide the Credit Union with a right to payment nor served, in any event, to extinguish the Debtor's preexisting indebtedness to the Credit Union; as for the Open–End Disbursement Receipt Plus, such document was never executed by the Debtor, which means that it also could neither constitute such an agreement nor extinguish such preexisting indebtedness. In light of the trial record, the Court must presume that the document that granted to the Credit Union a right to payment vis-a-vis the debt that the Debtor owed to the Credit Union prior to the May 31, 2002 borrowing transaction—presumably a note—also operates to grant to the Credit Union a right to payment as respects the $8,319 or $9,819 that the Credit Union lent to the Debtor on or about May 31, 2002. Such an arrangement compels the conclusion that the May 31, 2002 borrowing transaction constitutes nothing remotely resembling a "refinancing" for purposes of § 523(a)(2); instead, what the Credit Union did on such date, at least for purposes of § 523(a)(2), was to merely lend an additional amount of either $8,319 or $9,819 to the Debtor under the terms of a preexisting contract between the parties, which additional amount, for the reasons set forth in the preceding paragraph herein, constitutes the ceiling for the amount of the Credit Union's claim that conceivably could be declared nondischargeable pursuant to § 523(a)(2)(A).

### III. *Whether the Debtor made any sort of representation to the effect that the Mustang was a Roush Stage III Mustang?*

The Court next holds that the Credit Union fails to preponderantly prove that the Debtor ever represented to the Credit Union that the Mustang was a Roush Stage III Mustang. Consequently, no part of the Credit Union's $25,635.54 deficiency claim may be excepted from discharge pursuant to § 523(a)(2)(A). The Court so holds notwithstanding its finding, that is its conclusion that the Credit Union preponderantly proves, that someone told the Credit Union, prior to the culmination of the May 31, 2002 borrowing transaction, that the Mustang was a Roush Stage III Mustang.

The Court finds as it does first with respect to any written representation by the Debtor because the Debtor neither made any of the written "Roush Stage III" notations that were noted in the trial record, executed any document containing such written "Roush Stage III" notations subsequent to the making of such notations, nor ratified any such written "Roush Stage III" notation. As for a verbal representation by the Debtor, the Court finds that it is *just as likely as not* that the Debtor verbally represented to the Credit Union that the Mustang was a Roush Stage III Mustang. Unfortunately for the Credit Union, because it bears the burden of proof with respect to its cause of action under § 523(a)(2)(A), such a finding is of no use to the Credit Union; put differently, the Credit Union needed but failed to prove that it is *more likely than not* that the Debtor verbally represented to the Credit Union that the Mustang was a Roush Stage III Mustang.

Therefore, no part of the Credit Union's $25,635.54 deficiency claim may be excepted from discharge pursuant to § 523(a)(2)(A).

### IV. *The Debtor's request for attorney's fees under § 523(d).*

The Court denies with prejudice the Debtor's request for attorney's fees and

costs under § 523(d) because the Court finds, in turn, that the Credit Union's position under § 523(a)(2)(A) was substantially justified notwithstanding that, as set forth above, such position did not prevail.

### CONCLUSION

For the foregoing reasons, the Credit Union's $25,635.54 claim is not nondischargeable under § 523(a)(2)(A) and (B), that is such claim shall be discharged via the Chapter 7 discharge that will ultimately be received by the Debtor. The Debtor's request for attorney's fees and costs under § 523(d) is denied with prejudice.

An appropriate order will be entered.

### ORDER OF COURT

**AND NOW**, this **21st day** of **April, 2005**, upon consideration of the adversary complaint of Tri–Boro Federal Credit Union (hereafter "the Credit Union"), as well as the answer of the above-captioned debtor (hereafter "the Debtor"),

and after notice and a trial on the matter held on March 16, 2005,

and for the reasons set forth in the accompanying Memorandum Opinion dated **April 21, 2005,**

it is **hereby ORDERED, ADJUDGED, AND DECREED** that

(a) the Credit Union's $25,635.54 claim is **NOT NONDISCHARGEABLE** under § 523(a)(2)(A) and (B) and is thus **DISCHARGED** by virtue of the Chapter 7 discharge that will ultimately be received by the Debtor;

(b) **JUDGMENT** is, accordingly, entered **in favor of the Debtor** and **against the Credit Union** in the instant adversary proceeding; and

(c) the Debtor's request for attorney's fees and costs under § 523(d) is **DENIED WITH PREJUDICE.**