**In re Raymond Jerry BAXTER, Debtor.**

**International Fidelity Insurance Company, Plaintiff,**

v.

**Raymond Jerry Baxter, Defendant.**

**Bankruptcy No. 02–40232.
Adversary No. 02–4013.**

United States Bankruptcy Court,
M.D. Georgia,
Columbus Division.

May 29, 2003.

. Stephen G. Gunby, Columbus, GA, for debtor.

Clifford F. Altekruse, Atlanta, GA, James L. Fly, Holland & Knight, LLP, Orlando, FL, Barbara K. Hamilton, Wendell H. Livingston, Becket & Lee LLP, Raymond E. Kenny, Becket & Lee, Malvern, PA, for creditor.

## *MEMORANDUM OPINION*

JOHN T. LANEY, III, Bankruptcy Judge.

On January 15, 2003, the court conducted a trial on the Complaint of International Fidelity Insurance Company ("Plaintiff") Against Raymond Jerry Baxter ("Defendant") for determination of whether debt owed on a construction bond is nondischargeable because it was obtained by materially false financial statements under 11 U.S.C. § 523(a)(2)(B) or was obtained by fraud while acting as a fiduciary under 11 U.S.C. § 523(a)(4). At the conclusion of trial, the Court took the matters under advisement. After considering the evidence, the parties' stipulations and arguments, as well as the applicable statutory and case law, the Court makes the following findings of fact and conclusions of law.

## *FINDINGS OF FACT*

Plaintiff is a surety company that issues performance and payment bonds for building contractors and subcontractors who are required to post such bonds to bid and work on construction contracts. (*See* Compl., Answer). Defendant testified that he is the sole stockholder and sole officer of Rayco Painting and Sandblasting, Inc. ("Rayco"). Defendant admits, through testimony and admissions in his pleadings, that as an officer of Rayco, he had a business relationship with Georgia Surety, the local agent for Plaintiff. (*See id.*). Plaintiff issued bonds to Rayco, enabling Rayco to qualify to bid for and work on certain construction projects. (*See id.*). According to Defendant's testimony, he was also personally liable to Plaintiff under these bonds. According to testimony by Cyra Peterson, an employee of Georgia Surety and attorney-in-fact for Plaintiff, this business relationship existed for approximately five years prior to 2001. The incidents leading to this adversary proceeding allegedly occurred during 2001.

According to Rayco's former accountant, Steve Horne, there are two types of financial statements which are typically prepared for companies. One type is a compiled financial statement ("compiled statement") which includes accounting documents that have not been analyzed or reviewed by a certified public accountant ("CPA"). A compiled statement consists of a balance sheet, a profit/loss statement, a retained earnings statement, and supplements to the profit/loss statement. (*See generally* Pl.'s Ex. 2). Mr. Horne testified that the compiled statement is for internal use only. The second type of financial statement is a reviewed financial statement ("reviewed statement"). (*See generally* Pl.'s Ex. 1). In addition to the items that are in the compiled statement, a reviewed statement includes notes regarding the company's financial situation as representations of management and more detailed information on how the accounting documents were completed for the compiled statement. (*See id.*). This type of information is important to an out-

sider who might want to pursue some type of business relationship with the company.

As a standard business practice, Ms. Peterson testified that Plaintiff required Rayco to annually submit reviewed statements completed by a CPA, not only for consideration of new bonds requested by Rayco but also for existing bonds Plaintiff had issued for Rayco. Ms. Peterson testified that this requirement provided Plaintiff with assurance from a CPA that Rayco's situation was as it appeared on the reviewed statement. Ms. Peterson testified that a case manager kept the file current with updated financial statements and that the file was not brought to her attention unless a new bond was requested. However, Ms. Peterson testified that she did look over all reviewed statements as they came in, regardless of whether a new bond had been requested.

In regard to Rayco's 2000 reviewed statement which she received in the spring of 2001, Ms. Peterson testified that she completed only a cursory review of the document and its attachments. First, she looked at the letter from the CPA to make sure it was the same CPA as in the past. Ms. Peterson testified that she felt justified to rely on the letter purported to be from Mr. Horne because of Rayco and Mr. Horne's previous dealings with Plaintiff. Ms. Peterson went on to say that because of this reliance, she only looked at the purported letter from Mr. Horne, Rayco's equity, cash flow, cash position, and asset to liability ratio. Therefore, Ms. Peterson did not look at in great detail, if at all, the pages of the reviewed statement that had been altered. As testified to by Ms. Peterson and Defendant, the alterations would have been obvious upon further review because the totaled columns were inaccurate based on the altered numbers. In essence, the numbers did not add up. Ms.

Peterson concluded, based on her cursory review and reliance on the letter purported to be from Mr. Horne, that there was no cause for concern with Rayco. It was not until later in the summer of 2001 when problems began to arise that Ms. Peterson looked at the documents again and noticed that there were problems with them.

Mr. Horne testified that he created both compiled and reviewed statements for Rayco during the five years that Rayco dealt with Plaintiff. According to Defendant's secretary, Linda Bennett, she was the employee who supplied Mr. Horne with much of his information to complete both the compiled and reviewed statements.

For 2000, Mr. Horne testified that he was not initially able to complete either the compiled statement or the reviewed statement because Defendant, nor any employee of Rayco, supplied him with all of the information that he needed. Mr. Horne testified that he contacted Rayco in December 2000 or January 2001 and requested the missing documents and/or information so he could complete the compiled and reviewed statements. Mr. Horne followed-up with a letter dated March 3, 2001, detailing the missing information he needed. (*See* Pl.'s Ex. 4). Mr. Horne testified that after he sent this letter, he completed a rough draft of the compiled statement. Mr. Horne sent additional correspondence dated March 8, 2001 and attached a rough draft of the compiled statement for Defendant's review. (*See* Pl.'s Ex. 3). Mr. Horne requested that Defendant call him when the additional information was available. (*See id.*).

In response to a direct request from Rayco for the reviewed statement, Mr. Horne sent a letter dated March 12, 2001, along with a rough draft of the reviewed statement. (*See* Pl.'s Ex. 5). Mr. Horne specifically stated in the letter that the

financial statement was only a draft and once again requested that Defendant call him when the information he had requested was ready. (*See id.*). Mr. Horne testified that he did not know the specific reason Rayco had requested the reviewed statement, but he felt it was proper to send the draft so that Defendant could get a handle on where his business was financially. Mr. Horne testified that he did not prepare any financial statements for Rayco after this point. He further testified that he never resolved the issues with the 2000 reviewed statement, nor did he ever receive the necessary information to complete it.

Mr. Horne testified that it was not completely unusual that he had to wait to get information from Rayco but that in 2001 he had to wait longer than normal. Mr. Horne stated that he realized that Rayco's business was seasonal and at times hectic. Therefore, Mr. Horne did not feel the fact that he had to wait as long as he did was a conclusive indication of a problem. However, Mr. Horne testified that it was his belief that Rayco's financial problems likely began in 2000 and that is why he had difficulty getting the information he needed to complete the 2000 reviewed statement.

Mr. Horne testified that he did not hear from Rayco or about the 2000 financial statements again until July 23, 2001, when he received a fax from Marie Hartley, a Georgia Surety employee. (*See* Pl.'s Ex. 6). The fax consisted of what purported to be 2000 compiled and reviewed statements and letters purported to be from Mr. Horne certifying that he had prepared the statements. (*See id.*). Mr. Horne testified that he never issued final drafts, for third-party review, of the documents that he received from Ms. Hartley. While the document admitted into evidence shows Ms. Hartley's signature on the fax cover page, it was Ms. Peterson's testimony that she faxed this document to Mr. Horne. While this testimony is in conflict with the documentary evidence, it is apparent that Ms. Hartley worked for Ms. Peterson. This fax must have been sent at Ms. Peterson's direction.

Ms. Peterson testified that she attempted to speak with Mr. Horne regarding the document she had received from Rayco beginning in June 2001. Because of the accountant/client privilege, Mr. Horne contends that he was ethically required to get Rayco's permission before speaking with a representative of Plaintiff. Mr. Horne testified that he called Rayco and spoke with Ms. Bennett. In addition to requesting permission to speak to Plaintiff, Mr. Horne expressed his concerns to Ms. Bennett regarding the document in Plaintiff's possession. Mr. Horne testified that he never heard back from Rayco or Defendant, therefore he never spoke with Plaintiff regarding the documents it had received from Defendant.

Mr. Horne testified that the document he received from Ms. Hartley was similar to, but not the same as, the draft that he had given to Defendant. This surprised Mr. Horne because Plaintiff, nor any third-party, should not have received the information. Mr. Horne's testimony was that several of the numbers had been changed. While Mr. Horne admitted that he had no basis to swear that the numbers where incorrect, he testified that his inability was because he never received all the information he needed from Rayco. Mr. Horne admitted that on the face of the document, Rayco did not appear to be insolvent but reiterated that he never had the complete information to verify the solvency of Rayco for the year 2000.

Defendant contends that he does not remember Mr. Horne's trying to get in touch with him regarding the additional

information Mr. Horne claims to have needed. Further, Defendant also testified that he does not recall receiving a message that Mr. Horne needed to speak with him regarding Plaintiff's request to speak with Mr. Horne during the summer of 2001. In an attempt to explain how the altered document ended up in Plaintiff's possession, Defendant did admit that he changed the numbers on the draft reviewed statement to accurately reflect what he felt was the actual financial situation for Rayco. Defendant testified that he made these alterations after Plaintiff had pressured him into turning over the document and Mr. Horne had not complied with his request to finish the reviewed statement. Further, Defendant testified that he was unaware that the document forwarded to him by Mr. Horne was a draft reviewed statement that should not be shared with third parties.

Despite not knowing accounting principles, Defendant felt that the numbers he added were 100% accurate at that time. Defendant testified that he based the numbers he inserted in the altered statement on Rayco's 1999 financial statements prepared by Mr. Horne and the fact that 2000 business had exceeded the 1999 figures. Defendant testified that Rayco was not in financial trouble when he had Ms. Bennett send the financial statement to Plaintiff. To back up this contention, Defendant referred to a $50,000 line of credit that he got from Columbus Bank and Trust as evidence of Rayco's financial stability. While Plaintiff admitted that they requested and received this line-of-credit letter, no documentation of this line-of-credit was admitted into evidence. Defendant admits that he never told Plaintiff about the changes he made to the reviewed statement.

However, Defendant does deny telling Ms. Bennett to type the letter from the CPA or the reviewed statement notes. Defendant testified that he did not hear anything about the financial statement until October 2001, when Mr. Horne told him Plaintiff had inquired about it. Defendant testified that he never followed up with Plaintiff regarding the financial statement.

According to Ms. Bennett's testimony, Ms. Hartley was the Georgia Surety employee that she dealt with to keep Georgia Surety and Plaintiff up to date with Rayco's current financial status. Ms. Bennett stated that in the spring of 2001, Georgia Surety requested an updated financial statement. Ms. Bennett testified that she helped prepare the requested financial statement but she did not remember if it was a compiled or reviewed statement. Ms. Bennett testified that she made changes to the financial statement supplied by Mr. Horne at Defendant's request. Ms. Bennett admitted that she typed in the numbers on the financial statement. While Ms. Bennett did not specifically recall typing up the notes portion of the financial statement or the letter purportedly from Mr. Horne, she testified that if the notes and letter were sent to Georgia Surety then she would have typed them.

It is unclear according to the testimony and evidence as to why, but Plaintiff never issued any new bonds to Rayco after the altered financial statement was forwarded to Plaintiff. According to Ms. Bennett's and Defendant's testimony, in the late spring or early summer of 2001, Rayco's current and future business took a turn for the worse. Rayco was sued on a project out of Greenwood, South Carolina that was bonded by Plaintiff. A project at the Anniston Army Depot had claims filed by subcontractors for non-payment after the job was completed. (See Pl.'s Exs. 12, 13, 15). On the Anniston job, Ms. Bennett testified that the Army asked Rayco to hold payment on the job until the job could

be investigated. Therefore, Defendant's position is that the claims were unwarranted and eventually all claims were satisfied. Funding for another Army job was cut after just one-third of the job was completed. Rayco was even pulled off of one job, but failed to notify Plaintiff as required by the bonding contract. Ms. Bennett testified that Rayco began having trouble meeting its obligations because it had begun experiencing trouble getting paid for jobs. Ms. Bennett further testified that one of Rayco's top management team, Mr. Szabo, left the company because of disagreements with Defendant. By November 2001, Ms. Bennett stated that the bottom had fallen out and Rayco was out of business.

Defendant's and Ms. Bennett's elusive testimony leads the Court to believe that the forged letter and altered reviewed statement came from Rayco, at Defendant's request. However, the factual finding that Defendant procured the forged letter and altered the financial statement that were submitted to Plaintiff is not enough alone to create a nondischargeable debt under 11 U.S.C. § 523. The Court will now discuss the legal consequences of Defendant's actions.

## CONCLUSIONS OF LAW

Under 11 U.S.C. § 523, the discharge granted under 11 U.S.C. 727 does not include certain categories of debt. *See* 11 U.S.C. §§ 523, 727. As determined by Congress, certain types of debt are nondischargeable debt because of public policy considerations and an effort to curb abuse of the bankruptcy system. *See generally McClure v. Action Career Training (In re McClure)*, 210 B.R. 985, 988 (Bankr. N.D.Tex.1997); *Thatcher v. Austin (In re Austin)*, 36 B.R. 306, 310 (Bankr. M.D.Tenn.1984). Congress has determined that debtors should not be able to

acquire debt fraudulently, then file for bankruptcy, and have the debt discharged. *See Cohen v. de la Cruz*, 523 U.S. 213, 217, 118 S.Ct. 1212, 140 L.Ed.2d 341 (1998); *Ed Schory & Sons, Inc. v. Francis (In re Francis)*, 226 B.R. 385, 391 (6th Cir. BAP 1998). Hence, the policy reason behind 11 U.S.C. § 523(a)(2) and (4).

### *11 U.S.C. § 523(a)(2)(B)*

■ Chapter 11 of the United States Code § 523(a)(2) disallows discharge:

> for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by... (B)use of a statement in writing, (i) that is materially false; (ii) respecting the debtor's or an insider's financial condition; (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and (iv) that the debtor caused to be made or published with the intent to deceive.

11 U.S.C. § 523(a)(2). Plaintiff must prove each element by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991); *Equitable Bank v. Miller (In re Miller)*, 39 F.3d 301, 304 (11th Cir.1994).

■ First, Plaintiff must prove that there was an extension of credit. Plaintiff argues that by sitting on its contractual rights to call the bond in reliance on the altered financial statement and forged CPA letter, it extended credit to Rayco and Defendant, who was personally liable. There is a split in authority as to whether forbearance from exercising a contract right is an extension of credit. *Compare Field v. Mans*, 157 F.3d 35, 43 (1st Cir. 1998); *National City Bank v. Plechaty (In re Plechaty)*, 213 B.R. 119, 124–126 (6th Cir. BAP 1997); *Marine Bank Southwest N.A. v. Hoffman (In re Hoffman)*, 80 B.R. 924, 926–927 (Bankr.N.D.Ill.1988); *First Fed. Sav. and Loan Assoc. of Largo v.*

*Mancini (In re Mancini),* 77 B.R. 913, 914–916 (Bankr.M.D.Fla.1987); *and First Bank N.A. v. Eaton (In re Eaton),* 41 B.R. 800, 802–803 (Bankr.E.D.Wis.1984); *with Wolf v. Campbell (In re Campbell),* 159 F.3d 963, 966 (6th Cir.1998); *Telmark, LLC v. Booher (In re Booher),* 284 B.R. 191, 202–204 (Bankr.W.D.Pa.2002); *Howard & Sons, Inc. v. Schmidt (In re Schmidt),* 70 B.R. 634, 644–645 (Bankr. N.D.Ind.1986); *Drinker Biddle & Reath v. Bacher (In re Bacher),* 47 B.R. 825, 829 (Bankr.E.D.Pa.1985); *and Cement Nat'l Bank v. Colasante (In re Colasante),* 12 B.R. 635, 636–638 (E.D.Pa.1981).

According to *First Commercial Bank v. Robinson (In re Robinson),* 192 B.R. 569 (Bankr.N.D.Ala.1996), a case heavily relied upon by Plaintiff, forbearance from exercising a contract right because of reliance on fraudulent financial statements is tantamount to an "extension of credit" under 11 U.S.C. 523(a)(2)(B). *Robinson,* 192 B.R. at 575–576. Further, under the rational of the court in *Field,* continuing with a credit arrangement that the creditor had the right to terminate and the resulting loss due to the fraud can be called an "extension of credit" under 11 U.S.C. 523(a)(2)(A). *Field,* 157 F.3d at 43. While the case here deals with 11 U.S.C. § 523(a)(2)(B), the "extension of credit" language is used in the paragraph preceding sub-sections (A) and (B). 11 U.S.C. § 523(a)(2). Therefore, cases determining the meaning of an "extension of credit" are applicable both 11 U.S.C. § 523(a)(2)(A) and (B).

It is clear to the Court that Defendant submitted a materially false financial statement to Plaintiff in hope that Plaintiff would not call Rayco's bonds. In concealing the true financial situation of Rayco, which induced Plaintiff to not act on its contractual rights, Defendant received an extension of credit. Defendant, by his own testimony, admitted he submitted the financial statement to Plaintiff that he personally altered. Therefore, Plaintiff has satisfied its burden that the statement was made 1)in writing; 2)with materially false information; 3)regarding Rayco's financial situation; 4)by Defendant with the intent to deceive. 11 U.S.C. § 523(a)(2)(B).

■ However, Plaintiff must go one step further. Plaintiff must prove that the materially false information submitted by Defendant was reasonably relied up by Plaintiff. *See* 11 U.S.C. § 523(a)(2)(B)(iii). Here, Plaintiff has failed to meet its burden by a preponderance of the evidence. Plaintiff failed to prove that it reasonably relied upon the CPA's letter to determine that no further review of the financial statement was necessary. Under Ms. Peterson's own admission, the altered financial statement contained obvious errors. Plaintiff would have had to have shown that it is the standard in the industry to rely on a CPA's letter, rather than review the entire financial statement. Since Plaintiff only proved its own company policy, it did not prove that its reliance was reasonable. The reliance may have been justifiable. However, this is not the standard that Congress used when drafting this code section. *See* 11 U.S.C. § 523(a)(2)(B)(iii).

Further, the letter attached to the altered financial statement at issue here did not even contain Mr. Horne's signature. (*See* Pl.'s Ex. 6). Upon reviewing the 1999 reviewed statement submitted by Plaintiff, the letter accompanying the 1999 reviewed statement did contain Mr. Horne's signature. (*See* Pl.'s Ex. 1). The lack of a signature on the letter attached to the altered financial statement further demonstrates that Plaintiff has not proven that Ms. Peterson reasonably relied on what purported to be Mr. Horne's letter. This fact may even indicate a lack of justifiable

reliance by Plaintiff. The letter purportedly from the CPA with no signature should have brought some attention to the matter.

### 11 U.S.C. § 523(a)(4)

Chapter 11 of the United States Code § 523(a)(4) disallows discharge "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 523(a)(4). The only embezzlement or larceny statute presented to the Court was O.C.G.A. 16–8–15. Since Rayco's jobs at issue here were not completed in Georgia, this section is inapplicable.

■ As an additional argument, Plaintiff claims that Defendant held monies for payment to sub-contractors in trust until paid in full, thus creating a fiduciary relationship between Rayco and its sub-contractors. If the fraud or defalcation occurred while acting in a fiduciary capacity because of a trust, 11 U.S.C. § 523(a)(4) is only applicable if an express trust is created, but it is not applicable if a constructive trust is created. *See Barclays Am./Bus. Credit, Inc. v. Long (In re Long),* 774 F.2d 875, 878 (8th Cir.1985). The only case law presented to the Court on the issue is distinguishable from the present case because the contract contained a provision which created an express trust. *See Gillespi v. Jenkins (In re Jenkins),* 110 B.R. 74, 76 (Bankr.M.D.Fla.1990). Here, there is no such provision in the contract. (*See* Pl.'s Ex. 20).

■ However, in a post-trial brief, Plaintiff submitted New York Trust Law § 70 which creates a statutory trust "for funds received in connection with an improvement of real property in the state,... [including] a contract for public improvement...." N.Y. Trust Law § 70 (Consol.2002). Unlike constructive trusts, 11 U.S.C. § 523(a)(4) is applicable where statutory trusts exist and fraud or defalcation occurs. *See Bennett v. Wright (In re Wright),* 282 B.R. 510, 515 (Bankr.M.D.Ga.

2002)(J. Walker). Therefore, Defendant could be liable for losses incurred by Plaintiff for jobs in New York state where Plaintiff had to pay subcontractors after Defendant misappropriated funds for the same work and/or materials. However, because the issue of damages was reserved for later determination, once all jobs were completed and a definite amount could be determined, the Court cannot determine to what extent, if at all, Defendant is liable to Plaintiff on the New York state jobs.

The Court finds in favor of Defendant on the 11 U.S.C. § 523(a)(2)(B) allegation, but for Plaintiff on the 11 U.S.C. § 523(a)(4) allegation limited to jobs performed in New York if losses were incurred by Plaintiff because Defendant misappropriated funds received from the property owner. The amount, if any, will be determined at a future trial on the issue of damages.

An order in accordance with this Memorandum Opinion will be entered.