In re Christopher E. BEIMEL, Debtor.

Nathan P. Hagar, Clara Hagar, and Rose Traficante, Plaintiffs,

v.

Christopher E. Beimel, Defendant.

Bankruptcy No. 01–28059–MBM.
Adversary No. 02–2028–MBM.

United States Bankruptcy Court,
W.D. Pennsylvania.

June 26, 2009.

662

Rolf Louis Patberg, for Nathan P. Hagar, Clara Hagar, and Rose Traficante.

Donald R. Calaiaro, for Christopher E. Beimel.

## MEMORANDUM OPINION

M. BRUCE McCULLOUGH,
Bankruptcy Judge.

Nathan and Clara Hagar (hereafter "the

Hagars")[1] and Rose Traficante (hereafter "Traficante"), the instant plaintiffs, via the instant adversary proceeding, seek to have their claims for investment losses that they incurred pre-petition declared nondischargeable pursuant to 11 U.S.C. §§ 523(a)(2)(A) and 523(a)(2)(C). The Hagars' claim is for $207,000 and Traficante's claim is for $10,000. The Hagars and Traficante have advanced such claims against Christopher Beimel, the instant debtor (hereafter "the Debtor"), in particular, on the ground that the Debtor, while working first as a stockbroker and then essentially as a chief executive officer at an entity that the Court will henceforth refer to as Penn Capital, perpetrated a fraud and/or made fraudulent misrepresentations to the Hagars and Traficante that caused their investment losses.[2] For the reasons that are set forth below, and subsequent to a trial on the matter that was held on April 8, 2009, the Court determines that such claims of the Hagars and Traficante shall not be excepted from the Debtor's Chapter 7 discharge (i.e., such claims are not nondischargeable), that is, such claims shall be discharged by virtue of such Chapter 7 discharge.

### STATEMENT OF FACTS

The investment losses of the Hagars and Traficante that comprise the entirety of their claims can be traced to their respective purchases of securities that were personally issued by an individual named Philip Roy, Jr. (hereafter "Roy"). The parties agree that the aforesaid securities were collateralized by real estate that Roy personally owned, which real estate Roy, in turn, operated as a shopping center; such realty has been referred to by the parties, and the Court shall henceforth refer to it, as the Roy Plaza. The Hagars and Traficante have interchangeably described the securities that they received and which were personally issued by Roy (hereafter "the Roy Plaza Securities") as either preferred stock or debt obligations. However, the Court concludes that the Roy Plaza Securities necessarily constituted debt obligations because (a) Roy personally, rather than a corporation that he might have owned, issued the Roy Plaza Securities, (b) an individual can issue a debt obligation but an individual cannot issue stock in himself or herself, (c) the Roy Plaza Securities were collateralized by the Roy Plaza, and (d) stock cannot, while debt can, be collateralized.

Roy also owned and worked at Penn Capital, a financial services firm that, as mentioned above, employed the Debtor. The Debtor commenced his employment with Penn Capital in April 1994. At some point prior to then (apparently in February 1994) the Hagars invested a substantial sum of money—apparently approximately $207,000—to be managed by Penn

1. Because the plaintiffs' amended complaint indicates that the Hagars' last name is spelled as such, the Court will henceforth refer to them as "the Hagars" notwithstanding that such spelling may actually be incorrect.

2. As the Court understands it, Traficante, along with several other parties, obtained a pre-petition Pennsylvania state court default judgment against the Debtor. Unclear to the Court is whether the Hagars are one of the other state court parties that obtained such default judgment. Furthermore, the Court is uncertain as to the amount of such default

judgment with respect to any of those that obtained the same. The presence of such open factual issues, however, is irrelevant for purposes of resolving the instant adversary proceeding because Pennsylvania state court default judgments, as a matter of law, have no collateral estoppel effect in bankruptcy nondischargeability adversary proceedings (such as the instant one) regarding issues such as, for instance, the perpetration of fraud. *See In re Kartman*, 391 B.R. 281, 283 (Bankr. W.D.Pa.2008) (citing, *inter alia, In re Saler*, 205 B.R. 737, 741–742 (Bankr.E.D.Pa.1997)).

Capital, which money Penn Capital then invested on the Hagars' behalf in, and across, nine different mutual funds. The managers of the Hagars' "account" at Penn Capital—that is, those who managed the Hagars' investment—at the time of the mutual fund purchases were Roy and an individual named John Jarvis (hereafter "Jarvis").

At some point in December 1994 (and perhaps also in early January 1995) the Hagars' mutual fund investments were liquidated and the proceeds were then invested on the Hagars' behalf in Roy Plaza Securities.[3] The Hagars contend that the aforesaid mutual fund liquidation and Roy Plaza Securities purchase (hereafter "the December 1994 Transaction") was effectuated entirely without their consent. The Hagars also contend that it was the Debtor who was the one who effectuated the December 1994 Transaction. The Hagars apparently contend as much because they contend, in turn, that (a) Jarvis had disappeared at some point prior to December 1994, (b) the Debtor, at some point subsequent to Jarvis' disappearance, was anointed by Roy as a new manager of the Hagars' "account," and (c) the Debtor contacted the Hagars by telephone at some point in December 1994 and recommended to them that they engage in the December 1994 Transaction. The Debtor disputes all of the foregoing contentions by the Hagars excepting for the disappearance of Jarvis; in particular, the Debtor contends that (a) he was not the manager of the Hagars' "account" when the December 1994 Transaction occurred, (b) he never contacted the Hagars by phone in December 1994 as they contend, and (c) he had nothing to do with either the decision to engage in, or the effectuation of, the December 1994 Transaction. The Debtor contends that the only contact that he had with the Hagars prior to the effectuation of the December 1994 Transaction was at a meeting between Roy (and/or Jarvis) and the Hagars, at which meeting the Debtor did nothing more than make a presentation regarding the Roy Plaza Securities. The Debtor contends that, with respect to the Roy Plaza Securities and the Roy Plaza, he knew nothing more at that time than that which was contained in a prospectus, and that he consequently represented nothing more regarding such securities than that which was contained in such prospectus.

The Hagars contend that they persistently demanded that the December 1994 Transaction be unwound, but that such demands were to no avail. On February 10, 1995—and notwithstanding, contend the Hagars, that (a) they never authorized the December 1994 Transaction, and (b) they repeatedly demanded, without any success, that such transaction be unwound—the Hagars gave an additional $50,000 of cash to Penn Capital to invest on their behalf.

Roy died in April 1995. The estate for Roy (hereafter "the Roy Estate") asked the Debtor to take over the management of Penn Capital's affairs and the Debtor, at some point in May 1995, agreed to do so, effectively becoming its chief executive officer. The Debtor contends that it was not until May 1995 that he effectively took over management of the Hagars' "account" with Penn Capital. The Debtor concedes that, in May 1995 when he took over management of Penn Capital, he then became

---

**3.** As the Court understands it, the Hagars also invested through Penn Capital additional funds other than the $207,000 just mentioned, which funds were ultimately invested in securities other than the Roy Plaza Securities. As the Court understands it, none of the securities other than the Roy Plaza Securities constitute any part of the Hagars' $207,000 claim.

aware that perhaps at least one of the reasons why Roy had been issuing (i.e., selling) Roy Plaza Securities prior to his death was to repay some of those Penn Capital investors who had previously purchased such securities through Jarvis.

The Hagars consulted with an attorney named Louis Swartz (hereafter "Swartz") in June 1995, and Swartz attempted to then aid them in recovering (a) all of the money that they had given Penn Capital to invest on their behalf, and/or (b) the investments that had been made on their behalf. Mrs. Hagar testified that the Hagars consulted Swartz in response to information that she had obtained from her doctor—who, according to Mrs. Hagar, is the individual that first recommended the Hagars to Penn Capital years earlier—to the effect that Penn Capital was experiencing financial difficulties. Swartz testified that the Debtor, during the summer of 1995, repeatedly told him unequivocally that all of the Hagars' investments obtained through Penn Capital would be liquidated, and that the proceeds from such liquidation would then be forwarded on to the Hagars. All investments were apparently so liquidated · except for $207,000 worth of Roy Plaza Securities that were owned by the Hagars. The Debtor contrarily contends that he never told Swartz that he or Penn Capital could or would unequivocally liquidate the Roy Plaza Securities that were owned by the Hagars; instead, according to the Debtor, he (a) told Swartz that the Roy Estate was then undertaking to liquidate the Roy Plaza and that, subsequent to such liquidation, the Hagars, as well as other owners of the Roy Plaza Securities, would be repaid, and (b) knew only that which he was told by others regarding the liquidation of the Roy Plaza.

Prior to April 1994, which is when the Debtor commenced his employment with Penn Capital, the Debtor worked as a stockbroker with A.G. Edwards, another stock brokerage firm. While with A.G. Edwards, Traficante gave the Debtor $20,000 to invest on her behalf. The Debtor invested $10,000 of such $20,000 in an investment vehicle named the Keystone Liquid Asset Trust Class A (hereafter "the Keystone Trust"), and the other $10,000 in Pennsylvania Turnpike bonds. When the Debtor moved his employment to Penn Capital, he retained Traficante as a client, and so he continued to manage the aforesaid $20,000 of investments that he had previously made on her behalf.

On or about March 31, 1995, all of Traficante's $10,000 investment in the Keystone Trust was liquidated, and the entirety of the proceeds were then reinvested in Roy Plaza Securities (hereafter "the March 31, 1995 Transaction"). Traficante maintains that (a) she did not consent to either part of the March 31, 1995 Transaction (that is, neither the foregoing liquidation of her Keystone Trust investment nor the reinvestment of liquidation proceeds into Roy Plaza Securities), (b) her signature was actually forged on the Penn Capital liquidation request form that was utilized to effectuate the March 31, 1995 Transaction (hereafter "the Liquidation Request Form"), and (c) the Debtor is the one that committed such forgery. The Debtor contends, on the other hand, that (a) Traficante, at a meeting in March 1995, approved both parts of the March 31, 1995 Transaction, (b) the Liquidation Request Form was completed only after Traficante so consented to the March 31, 1995 Transaction, (c) he did not prepare any portion of the Liquidation Request Form, and (d) he thus did not commit any forgery of Traficante's signature on such form.

At some subsequent point in 1995 Traficante demanded that the Debtor return to her all of the funds that he was presently

managing for her on her behalf. The Debtor then returned to Traficante the $10,000 that had been invested on her behalf in Pennsylvania Turnpike bonds; the Debtor never returned to her the $10,000 that had been invested in Roy Plaza Securities.

In October 1995 Penn Capital was shut down by the Securities & Exchange Commission (SEC), and all assets then possessed by Penn Capital were frozen. Although not elucidated by the parties at trial, as the Court understands it, the SEC froze the liquidation by the Roy Estate of assets that it then owned as well, such as, for instance, the Roy Plaza.

The SEC, through a forced sale government auction, ultimately liquidated the Roy Plaza for an amount between $300,000 and $400,000. On the basis of the amount of such liquidation proceeds obtained, the Hagars and Traficante contend—obviously in retrospect—that the Roy Plaza was woefully inadequate to have collateralized the Roy Plaza Securities at the time when they were issued. The Debtor, however, credibly testified, without either objection or rebuttal, that (a) the Roy Plaza had been appraised, (b) such appraisal indicated that such real estate was then worth approximately $2.2 million, and (c) such amount was sufficient at all times prior to the Roy Plaza's ultimate liquidation—that is, when the Roy Plaza Securities were issued, in May 1995 when the Debtor assumed management of Penn Capital, and in the summer of 1995 when the Debtor had conversations with Swartz—to cover not only mortgages on such real estate but also the total repayment of the Roy Plaza Securities.

### DISCUSSION

The Hagars and Traficante contend that there were several instances during the course of their dealings with the Debtor where the Debtor either made fraudulent misrepresentations to them and/or engaged in actual fraud with respect to them, and that such instances compel a determination by this Court that their claims against the Debtor be declared nondischargeable pursuant to §§ 523(a)(2)(A) and 523(a)(2)(C).

11 U.S.C. §§ 523(a)(2)(A) provides, in pertinent part, as follows:

(a) A discharge under section 727 ... of this title does not discharge an individual *debtor from any debt*—

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

11 U.S.C.A. § 523(a)(2)(A) (West 2008). In order for a debt to be excepted from discharge under § 523(a)(2)(A), a creditor must prove the following elements by a preponderance of the evidence:

(1) the debtor made ... [a] representation;

(2) [at] the time of the representation, the debtor knew it to be false;

(3) the debtor made the representation with the intent and purpose of deceiving the plaintiff;

(4) the plaintiff justifiably relied on the representation; and

(5) the plaintiff sustained a loss or damage as the proximate consequence of the representation having been made.

4 *Collier on Bankruptcy,* ¶ 523.08[1][e] at 523–45 to 46 (Bender 2008); *see also In re Kielur,* 323 B.R. 910, 914 (Bankr.W.D.Pa. 2005) (" 'The party seeking to establish an exception to the discharge of a debt [under § 523(a)(2)(A) ] bears the burden of proof

... by a preponderance of the evidence.' ").

■■■■ Also, "as a threshold matter under ... § 523(a)(2)(A) ..., a creditor must demonstrate not only that a debtor made a fraudulent misrepresentation but also that such debtor obtained "money, property, services, or an extension, renewal, or refinancing of credit" from such creditor by virtue of said misrepresentation." *In re Booher*, 284 B.R. 191, 200 (Bankr.W.D.Pa. 2002) (pointing out that the plain language of § 523(a)(2) preceding paragraphs (A) through (C) confirms as much); *see also* 4 *Collier on Bankruptcy*, ¶ 523.08[1][d] at 523–44.9 & ¶ 523.08[1][a] at 523–44.7 (the preceding follows because "[n]ot all frauds are included within the exception of section 523(a)(2)(A), but only those involved in the obtaining of money, property[,] ... services[, or an extension, renewal, or refinancing of credit]"); *Kielur*, 323 B.R. at 914 (citing *Booher*); *In re Lages*, 386 B.R. 590, 598 (Bankr.W.D.Pa.2008) (same proposition); *In re Preston*, 47 B.R. 354, 357–358 (E.D.Va.1983) (cited by the Debtor in his papers). Moreover,

> because a creditor necessarily cannot demonstrate that a debtor obtained requisite consideration from such creditor by virtue of ... a misrepresentation if such debtor obtained such consideration prior to having made said misrepresentation, ... such creditor, in order to prevail under § 523(a)(2)(A) ..., must prove that such debtor made an actionable misrepresentation prior to such debtor's acquisition of such consideration from such creditor.

*Booher*, 284 B.R. at 201 (citing 4 *Collier on Bankruptcy*, ¶ 523.08[1][d] at what is now 523–44.10); *see also Kielur*, 323 B.R. at 914 (citing *Booher*); *Lages*, 386 B.R. at 598 (same proposition); *Preston*, 47 B.R. at 358 (cited by the Debtor in his papers).

■■■■ As for the pleading of § 523(a)(2)(C) by the Hagars and Traficante, the Court is frankly bewildered. 11 U.S.C. § 523(a)(2)(C) provides that, for purposes of § 523(a)(2)(A), certain consumer debts are presumed to be nondischargeable, namely consumer debts aggregating more than a certain dollar amount for luxury goods or services and cash advances aggregating more than a certain dollar amount. *See* 11 U.S.C.A. § 523(a)(2)(C) (West 2008). Unfortunately for the Hagars and Traficante, any indebtedness that might ultimately be imposed upon the Debtor for their investment losses cannot even remotely be characterized as (a) a consumer debt, (b) a debt for luxury goods or services, or (c) a debt for a cash advance. Therefore, the claims of the Hagars and Traficante cannot be excepted from the Debtor's Chapter 7 discharge pursuant to § 523(a)(2)(C).

### I. *The Hagars' Claim.*

With respect to the Hagars' § 523(a)(2)(A) position, the Court identifies five discrete fraudulent misrepresentations or actual frauds that the Hagars contend were perpetrated by the Debtor. In particular, the Hagars contend that:

(a) the Debtor committed actual fraud by his effectuation of the December 1994 Transaction entirely without their consent;

(b) the Debtor made fraudulent misrepresentations to them regarding the Roy Plaza Securities;

(c) the Debtor (i) had a duty to disclose to them (and other investors) that at least one of the reasons why Roy had been issuing Roy Plaza Securities prior to his death was to repay some of those Penn Capital investors who had previously purchased such securities through Jarvis, which duty the Debtor breached, and (ii) there-

by made a fraudulent misrepresentation;

(d) the Debtor fraudulently misrepresented to Swartz (the Hagars' counsel)—and, thus, to them as well since Swartz was their agent—in the summer of 1995 that the Debtor and Penn Capital were actively liquidating the Roy Plaza Securities that the Hagars then owned; and

(e) the Debtor (i) had a duty to disclose to them and Swartz (as their agent) in the summer of 1995 that funds did not then exist to satisfy the Roy Plaza Securities, which duty the Debtor breached, and (ii) thereby made a fraudulent misrepresentation.

Unfortunately for the Hagars, the Court holds, for the reasons set forth below, that the Hagars cannot prevail with respect to any of their foregoing contentions.

### A. December 1994 Transaction.

■ The Hagars fail to preponderantly prove that the Debtor even (a) contacted them by telephone in December 1994, (b) recommended to them then that they engage in the December 1994 Transaction, or (c) was the manager of their "account" at that time, let alone that it was the Debtor who actually effectuated the December 1994 Transaction. Put differently, it is equally likely that it was someone other than the Debtor—such as, for instance, Roy—who actually effectuated the December 1994 Transaction. Because the Hagars fail to preponderantly prove that the Debtor was the one who actually effectuated the December 1994 Transaction, it necessarily follows that the Hagars fail to preponderantly prove that the Debtor thereby committed actual fraud.

The Court also cannot find to be credible the Hagars' contention that they vigorously opposed Penn Capital's effectuation of the December 1994 Transaction on their behalf (and that they repeatedly demanded without success that such transaction be unwound), yet they then invested, just a couple of months later, an additional $50,000 with Penn Capital. That the Hagars invested such $50,000 under such circumstances strongly tends to prove that, in any event, they ratified the December 1994 Transaction; if the Hagars did so ratify such transaction, then, of course, such ratification serves to cut off proximate causation of loss/damages so that such transaction (and any potential accompanying fraud) did not proximately cause any loss or damages that they ultimately suffered. Because it is at least as likely as not that the Hagars ratified the December 1994 Transaction, the Court must hold that the Hagars fail to preponderantly prove the requisite proximate causation of loss or damages.

### B. Representations regarding Roy Plaza Securities.

■ The Court understands the Hagars to broadly contend that the Debtor fraudulently misrepresented to them, prior to their purchase of the Roy Plaza Securities, that such securities were a sound investment when, in fact, such securities constituted a bogus, or at least a poor, investment. However, such representation can only be false if the Roy Plaza Securities were a poor investment when the same were purchased; that such securities subsequently became largely worthless does not conclusively demonstrate the falsity of any representation as to the soundness of such securities at a prior point in time. Because the Court finds that it is at least as likely as not that the Roy Plaza, which realty served as collateral for the Roy Plaza Securities, was, at the time of the Hagars' purchase of the Roy Plaza Securities, worth an amount sufficient to satisfy not only the mortgages that encumbered

such realty but also the total repayment of such securities, and since the Hagars bear the burden of proving the contrary if they wish to successfully prove that the Debtor made a false statement regarding the soundness of such securities, the Court must hold that the Hagars fail to preponderantly prove that the Debtor made such a false representation.

Equally damaging to the Hagars' position is the Court's conclusion that it is at least equally likely that, when he made representations to the Hagars regarding the Roy Plaza Securities and the Roy Plaza, the Debtor (a) knew nothing with respect to the same other than that which was contained in a prospectus, (b) said nothing more regarding such securities than that which was contained in such prospectus, and (c) was unaware whether any information contained in such prospectus was false. Such conclusion by the Court compels, in turn, a conclusion that the Hagars fail to preponderantly prove that the Debtor, when he made representations regarding the Roy Plaza Securities, knew then that the same were false.

Finally, since the Hagars fail to preponderantly prove that the Debtor, when he made representations regarding the Roy Plaza Securities, knew then that the same were false, the Hagars necessarily also fail to preponderantly prove that the Debtor made such representations with the requisite intent to deceive the Hagars.

### C. *Failure to disclose that Roy was issuing Roy Plaza Securities, in part, to repay prior investors.*

■ As a threshold matter, the Court must hold that any fraudulent misrepresentation that the Debtor might be deemed to have made by virtue of failing to make a disclosure, to wit that at least one of the reasons why Roy had been issuing Roy Plaza Securities prior to his death was to repay some of those Penn Capital investors who had previously purchased such securities through Jarvis (hereafter "the Repayment Purpose"), is not actionable, at least with respect to the Hagars, under § 523(a)(2)(A) simply because of the timing of such deemed misrepresentation. The Court so holds because (a) the Debtor proved (and, at a bare minimum, the Hagars failed to preponderantly disprove) that he did not learn about the Repayment Purpose until, at the earliest, May 1995, (b) any failure by the Debtor to disclose the Repayment Purpose (and thus any deemed fraudulent misrepresentation by the Debtor), therefore, did not occur until, at the earliest, May 1995, (c) the Hagars purchased all of the Roy Plaza Securities that they ever owned prior to May 1995, (d) any failure by the Debtor to make the aforesaid disclosure (and thus any deemed fraudulent misrepresentation by the Debtor), therefore, necessarily occurred subsequent, rather than prior, to the receipt of any consideration from the Hagars, and (e) a misrepresentation can be actionable—and a cause of action can thus potentially be meritorious—under § 523(a)(2)(A), as a matter of law (as set forth above), only if a debtor made such misrepresentation to another prior to such debtor's acquisition of consideration from such other.

■ That the Debtor did not obtain any consideration from the Hagars subsequent to any failure by the Debtor to disclose the Repayment Purpose also follows regardless of whether the Hagars, as a result of such failure to disclose, forbore from bringing some sort of collection action on their Roy Plaza Securities. The Court so holds because such possible forbearance constitutes neither "money, property, services, [n]or an extension, renewal, or refinancing of credit" for purposes of § 523(a)(2). That such possible forbear-

ance constitutes neither money, property, services, a renewal of credit, nor a refinancing of credit for purposes of § 523(a)(2) is obvious. Furthermore, this Court has previously held that, contrary case authority notwithstanding, the mere forbearance from exercising a contract right—such as making demand upon a demand note or otherwise accelerating the due date of an obligation—does not constitute an extension of credit for purposes of § 523(a)(2). *See Booher*, 284 B.R. at 202–204; *Kielur*, 323 B.R. at 914–915 (citing *Booher*). However, even if this Court were to follow contrary case authority and thereby accept the proposition that mere forbearance from exercising a contract right can constitute an extension of credit for purposes of § 523(a)(2), *see In re Baxter*, 294 B.R. 800, 806–807 (Bankr.M.D.Ga. 2003) ("There is a split in authority as to whether forbearance from exercising *a contract right* is an extension of credit"), such would not be helpful to the Hagars' cause. That is because the Hagars fail to preponderantly prove—indeed they even fail to attempt to preponderantly prove—that there was any contract right vis-a-vis their Roy Plaza Securities that they could

have exercised in response to Roy having issued some Roy Plaza Securities prior to his death so as to repay certain of the prior investors in such securities.[4] Also problematical for the Hagars—if this Court were to accept the foregoing contrary case authority—is the fact that Roy, rather than either the Debtor or Penn Capital, was the obligor (i.e., the only one liable) on the debt obligations that were the Roy Plaza Securities; that being the case, any forbearance by the Hagars from suit upon the Roy Plaza Securities, even if it would have constituted an extension of credit for purposes of § 523(a)(2), would have constituted such an extension of credit that would have been obtained by either Roy or the Roy Estate, not one that would have been obtained by the Debtor on either his own behalf or that of Penn Capital. The latter point is fatal to the Hagars' cause because this Court holds, as a matter of law, that unless such an extension of credit (or, for that matter, money, property, services, etc.) would have somehow benefitted the Debtor, such extension of credit would not be actionable against the Debtor under § 523(a)(2), *see 4 Collier on Bankruptcy*, ¶ 523.08[1][a] at 523–44.8 (al-

---

**4.** For instance, the Hagars fail to preponderantly demonstrate that the Roy Plaza Securities were demand notes, or that such securities contained any right to accelerate, for any reason, their due dates. Furthermore, the Hagars' contention that the Roy Plaza Securities constituted a Ponzi scheme, and an argument by them that they could have perhaps sued upon learning of such scheme, would not be helpful to them because (a) such a suit would constitute a tort, rather than a contract, action, and (b) the right to bring a tort action does not constitute a contract right. More importantly, the Hagars fail to even preponderantly prove that the Roy Plaza Securities constituted a Ponzi scheme. The Court so holds because (a) "a [P]onzi scheme is a fraudulent investment arrangement in which returns to investors are not obtained from any underlying business venture but are taken from monies received from new inves-

tors," *In re Taubman*, 160 B.R. 964, 978 (Bankr.S.D.Ohio 1993); *see also In re C.F. Foods, L.P.*, 280 B.R. 103, 110 n. 15 (Bankr. E.D.Pa.2002) (quoting *Taubman* ), (b) the Hagars fail to preponderantly prove either that profits that were paid to Roy Plaza Securities investors generally came from anything other than the operation of the Roy Plaza or that such operation was fictitious, (c) the Roy Plaza Securities were collateralized by the Roy Plaza, which realty was indisputably existent (i.e., legitimate), and (d) the Court finds, as set forth above, that it is at least as likely as not that the Roy Plaza was, at the time of the Hagars' purchase of the Roy Plaza Securities as well as in May 1995 or during the summer of 1995, worth an amount sufficient to satisfy not only the mortgages that encumbered such realty but also the total repayment of such securities.

though a debtor need not be benefitted directly, such debtor must obtain at least an indirect benefit); no such showing of benefit to the Debtor has been preponderantly made (or attempted to be made) by the Hagars.

The Court also holds that the Hagars fail to preponderantly prove that they sustained a loss or damage as the proximate consequence of the Debtor's failure to disclose the Repayment Purpose. The only loss or damage to the Hagars that the Court can possibly discern is their loss of a chance to (a) dispose of their Roy Plaza Securities before October 1995 when the SEC, *inter alia*, froze the liquidation of the Roy Estate, and (b) sue in response to information regarding the Repayment Purpose. However, the Hagars fail to preponderantly prove that, if they had wished to, they could have liquidated the Roy Plaza Securities by October 1995; the Court so holds because (a) such securities were patently nonmarketable, and (b) Penn Capital was not the issuer of such securities and so it did not have any obligation to buy them back from the Hagars. As for any collection suit upon such securities, the Hagars fail to preponderantly prove, as set forth at, and in the text immediately preceding, footnote 2 above, that they could have possibly prevailed in any such lawsuit.

Finally, the Hagars fail to preponderantly prove that the Debtor intended to deceive them by failing to disclose the Repayment Purpose. The Court so holds because the Debtor credibly testified that he did not ascertain any reason to so inform holders of the Roy Plaza Securities, that is he did not believe that such information was material. The Court finds such testimony to be credible given his credible testimony that, in turn, he believed that the Roy Plaza, which realty served as collateral for the Roy Plaza Securities, was, at all times prior to the Roy Plaza's ultimate forced-sale liquidation by the federal government, worth an amount sufficient to satisfy not only the mortgages that encumbered such realty but also the total repayment of such securities.

### D. Summer 1995 representations and failure to disclose to Swartz regarding liquidation of the Roy Plaza Securities.

 As a threshold matter, the Court must hold that any representations that the Debtor may have made to Swartz, the Hagars' counsel, in the summer of 1995 regarding the liquidation of the Hagars' Roy Plaza Securities (hereafter "the Summer 1995 Swartz Representations"), is not actionable under § 523(a)(2)(A) merely because of the timing of such representations. The Court holds likewise, at least with respect to the Hagars, regarding any fraudulent misrepresentation that the Debtor might be deemed to have made by virtue of failing to disclose in the summer of 1995 that funds did not then exist to satisfy the Roy Plaza Securities (hereafter "the Summer 1995 Nondisclosure"). The Court so holds (a) because, as is precisely the case with respect to the Debtor's failure to disclose the Repayment Purpose (which occurred no earlier than May 1995), both the Summer 1995 Swartz Representations and the Summer 1995 Nondisclosure necessarily occurred subsequent, rather than prior, to the receipt of any consideration from the Hagars (sometime prior to May 1995), and (b) since, as set forth above, a misrepresentation can be actionable—and a cause of action can thus potentially be meritorious—under § 523(a)(2)(A), as a matter of law, only if a debtor made such misrepresentation to another prior to such debtor's acquisition of consideration from such other. That the Debtor did not obtain any consideration from the Hagars subsequent to either the Summer 1995 Swartz Representations or

the Summer 1995 Nondisclosure also follows regardless of the Hagars' contention that, as a result of such representations and nondisclosure, they forbore from bringing some sort of collection action on their Roy Plaza Securities. The Court so holds for precisely the same reason, as set forth above, that a similar forbearance by the Hagars in response to the Debtor's failure to disclose the Repayment Purpose did not constitute consideration from them.

The Court also holds that the Hagars fail to preponderantly prove that they sustained a loss or damage as the proximate consequence of either the Summer 1995 Swartz Representations or the Summer 1995 Nondisclosure. The Court so rules for precisely the same reason, as set forth above, that the Hagars fail to preponderantly prove that they sustained a loss or damage as the proximate consequence of the Debtor's failure to disclose the Repayment Purpose.

The Hagars also fail to preponderantly prove that the Debtor actually made the Summer 1995 Swartz Representations that the Hagars allege he made. The Court so holds because the Debtor credibly testified—and, thus, it is at least as likely as not—that he (a) never told Swartz that he or Penn Capital could or would unequivocally liquidate the Hagars' Roy Plaza Securities, and (b) instead told Swartz that the Roy Estate was then undertaking to liquidate the Roy Plaza and that, subsequent to such liquidation, the Hagars, as well as other holders of the Roy Plaza Securities, would be repaid. Because the Debtor also credibly testified—and, thus, it is at least as likely as not—that he knew only that which he was told by others regarding the liquidation of the Roy Plaza, the Hagars likewise fail to preponderantly prove that the Debtor (a) knew of the falsity of that which he told Swartz, if what the Debtor told Swartz was false (which, as just set forth, was not preponderantly proven), and (b) intended to deceive Swartz and the Hagars when he made representations to Swartz.

Finally, with respect to the Summer 1995 Nondisclosure, the Hagars fail to preponderantly prove that the Debtor actually failed to disclose in the summer of 1995 that funds did not then exist to satisfy the Roy Plaza Securities. The Court so holds (a) because, as set forth above, it is equally likely that the Debtor told Swartz and, thus, the Hagars that the Roy Estate was then undertaking to liquidate the Roy Plaza and that, subsequent to such liquidation, the Hagars, as well as other holders of the Roy Plaza Securities, would be repaid, and (b) since such statement by the Debtor strongly implies that, absent liquidation of the Roy Plaza, funds did not then exist sufficient in amount to pay off investors in full. Because it is thus at least as likely as not that the Debtor implicitly conveyed to Swartz and the Hagars that, absent liquidation of the Roy Plaza, funds did not then exist sufficient in amount to pay off investors in full, the Hagars also fail to preponderantly prove that the Debtor intended to deceive them by failing to explicitly disclose the same information. Lastly, the Hagars are way off base if, and to the extent that, they contend that the Debtor committed fraud by failing to disclose that Penn Capital itself lacked funds in the summer of 1995 sufficient in amount to pay off holders of the Roy Plaza Securities. The Court must so hold because (a) the Debtor only had a duty to disclose material, relevant information so as to avoid committing a fraud, see 4 *Collier on Bankruptcy*, ¶ 523.08[1][d] at 523–44.9 & ¶ 523.08[1][e] at 523–45 ("The concealment of *material facts* by a fiduciary may also be fraud"), (b) Penn Capital, as set forth above, lacked any legal obligation to itself satisfy the Roy Plaza Securities, (c) whether Penn Capital itself lacked funds in the

summer of 1995 sufficient in amount to pay off holders of such securities was, therefore, immaterial and irrelevant, (d) the Debtor thus had no duty to disclose as much, (e) one, of course, cannot commit fraud by failing to disclose that which one has no duty to disclose, and (f) the Debtor thus could not have committed fraud by failing to disclose the nature of Penn Capital's financial situation in the summer of 1995.

## II. *Traficante's Claim.*

With respect to Traficante's § 523(a)(2)(A) position, the Court identifies four discrete fraudulent misrepresentations or actual frauds that Traficante apparently contends were perpetrated by the Debtor. In particular, Traficante contends that:

(a) the Debtor committed actual fraud by (i) his effectuation of the March 31, 1995 Transaction entirely without her consent, and (ii) forging her signature on the Liquidation Request Form; and

(b) the Debtor made fraudulent misrepresentations to her in March 1995 regarding the Roy Plaza Securities.

The Court also presumes that Traficante argues, much like the Hagars, that:

(a) the Debtor (i) had a duty to disclose the Repayment Purpose to her, which duty the Debtor breached, and (ii) thereby made a fraudulent misrepresentation; and

(b) the Summer 1995 Nondisclosure likewise constitutes a deemed fraudulent misrepresentation by the Debtor towards her.

### A. *March 31, 1995 Transaction.*

After trial, the Court holds that Traficante fails to preponderantly prove either (a) that the Debtor effectuated the March 31, 1995 Transaction entirely without her consent, or (b) that he forged her signature on the Liquidation Request Form. The Court must so hold because the Court finds it to be at least equally likely that (a) Traficante consented to the March 31, 1995 Transaction, as is maintained by the Debtor, and (b) Traficante's signature was forged on the Liquidation Request Form by someone other than the Debtor (if Traficante's signature was even forged on the Liquidation Request Form). Because Traficante fails to preponderantly prove either that the Debtor effectuated the March 31, 1995 Transaction entirely without her consent, or that he committed the aforesaid forgery, it necessarily follows that Traficante fails to preponderantly prove that the Debtor thereby committed actual fraud.

### B. *Representations regarding Roy Plaza Securities.*

The Court understands Traficante to broadly contend, as do the Hagars, that the Debtor fraudulently misrepresented to her, prior to her March 31, 1995 purchase of the Roy Plaza Securities, that such securities were a sound investment when, in fact, such securities constituted a bogus, or at least a poor, investment. Such position of Traficante fails, however, for precisely the same reasons that the Hagars did not prevail in similarly arguing, namely Traficante does not preponderantly prove that (a) the Roy Plaza Securities even constituted a poor investment when they were sold to her (thus no false representations were preponderantly proven to have been made by the Debtor regarding their soundness), (b) the Debtor, when he made representations regarding the Roy Plaza Securities, knew then that the same were false, and (c) the Debtor made such representations with the requisite intent to deceive Traficante.

### C. *The 2 Nondisclosures.*

Although the Court will presume that Traficante contends that the Debtor failed to disclose to her the Repayment Purpose, that the Debtor also committed the Summer 1995 Nondisclosure, and that both failures to disclose constitute deemed fraudulent misrepresentations by the Debtor that are actionable under § 523(a)(2)(A), the Court holds that, for precisely the same reasons that the Hagars did not prevail in similarly arguing, such contentions by Traficante are meritless. More particularly, the Court so holds because (a) any failure by the Debtor to disclose the Repayment Purpose to anyone (including Traficante), as set forth above, could not have occurred until, at the earliest, May 1995, (b) the Summer 1995 Nondisclosure necessarily did not occur until even subsequent to May 1995 (i.e., it happened in the "summer of 1995"), (c) Traficante purchased all of the Roy Plaza Securities that she ever owned on March 31, 1995, or prior to May 1995, (d) any failure by the Debtor to make the two aforesaid nondisclosures (and thus any deemed fraudulent misrepresentation by the Debtor), therefore, necessarily occurred subsequent, rather than prior, to the receipt of any consideration from Traficante, and (e) a misrepresentation can be actionable—and a cause of action can thus potentially be meritorious—under § 523(a)(2)(A), as a matter of law, only if a debtor made such misrepresentation to another prior to such debtor's acquisition of consideration from such other. The Court also summarily incorporates into its decision herein regarding Traficante vis-a-vis the two aforesaid nondisclosures the remainder of its analysis as to why the Hagars fail to prevail regarding their position that the two aforesaid failures to disclose constitute actionable fraudulent misrepresentations by the Debtor.

### *CONCLUSION*

For all of the foregoing reasons, the Court determines that the Hagars' $207,000 claim and Traficante's $10,000 claim shall not be excepted from the Debtor's Chapter 7 discharge (i.e., such claims are not nondischargeable), that is, such claims shall be discharged by virtue of such Chapter 7 discharge.

### *ORDER OF COURT*

**AND NOW,** this **26th day of June, 2009,** for the reasons set forth in the accompanying Memorandum Opinion of the same date; and subsequent to notice and a trial on the matter that was held on April 8, 2009, it is **hereby ORDERED, ADJUDGED, AND DECREED** that the $207,000 claim of Clara and Nathan P. Hagar and the $10,000 claim of Rose Traficante shall not be excepted from the Debtor's Chapter 7 discharge (i.e., such claims are not nondischargeable), that is, such claims shall be discharged by virtue of such Chapter 7 discharge.